

1   David Fleck (State Bar No. 192912)
    DavidFleck@RudowLaw.com
2   William M. Rudow
    WilliamRudow@RudowLaw.com
3   Members of Rudow Law Group, LLC
    5603 Newbury Street
4   Baltimore MD 21209
    Telephone     (410) 542-6000
5   Facsimile       (410) 542-9500

6   Attorneys for Plaintiff

7

8                       UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
9                           OAKLAND DIVISION     **C10-04285**

10   FEDERAL DEPOSIT INSURANCE         )   Case No.: [Case number]
    CORPORATION, In Its Capacity as Receiver )
11   for NetBank, FSB                       )   COMPLAINT FOR BREACH OF
                                          )   CONTRACT/BREACH OF FIDUCIARY
12         Plaintiff,                       )   DUTY; NEGLIGENCE; AND FRAUD.
                                          )
13         vs.                               )
                                          )
14   GOLDEN KEY REALTY & MORTGAGE     )
    BANKER, INC., a California corporation,   )
15                                           )
    SAMUEL GBILIA, an individual         )
16                                           )
    FIRST AMERICAN TITLE INSURANCE   )
17   COMPANY, a California corporation,       )
                                          )
18   STEWART TITLE OF SACRAMENTO, a   )
    California corporation,                   )
19                                           )
    STEWART TITLE GUARANTY             )
20   COMPANY, a Texas corporation, and     )
                                          )
21   UNITED CAPITAL TITLE INSURANCE   )
    COMPANY, a California corporation.       )
22                                           )
        Defendant.                       )
23

24

| | |
|---|---|
| 1 | Plaintiff Federal Deposit Insurance Corporation ("FDIC" or "Plaintiff"), in its capacity as |
| 2 | Receiver of NetBank, avers and alleges as follows as its complaint ("Complaint") against |
| 3 | Defendants Golden Key Realty & Mortgage Banker, Inc. ("Golden Key"), Samuel Gbilia |
| 4 | ("Gbilia"), First American Title Insurance Company ("1st American"), Stewart Title of |
| 5 | Sacramento ("Stewart-Sac"), Stewart Title Guaranty Company ("Stewart Title") and United |
| 6 | Capital Title Insurance Company ("United"). |

**JURISDICTION**

1.  This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §
    1819(b)(2)(A), which provides that all suits of a civil nature at common law or in equity
    to which the FDIC, in any capacity, is a party shall be deemed to arise under the laws of
    the United States.

**NATURE OF THE CASE**

2.  This Complaint is a mortgage loan fraud/negligence recovery action arising from a
    portfolio of eleven (11) loans made for the purchase of six (6) residential properties.
    Gbilia and Golden Key, acting simultaneously as seller's agent and/or mortgage broker,
    initiated all of the loans. The scheme included using straw buyers, falsified financial
    information and inflated appraisals. The escrow holder defendant – Stewart-Sac – either
    enabled or actively participated in the mortgage loan fraud scheme, inter alia, by
    breaching closing instructions and/or otherwise improperly allowing loans to close. The
    title insurance underwriter defendants granted closing protection letters to the lender.

1    The closing protection letters protected the lender and its assigns from the types of losses

2    caused by the title insurance underwriters' agents as alleged in this Complaint.

3

4                                              **PARTIES**

5    3. Plaintiff FDIC is a corporation and instrumentality of the United States of America,

6       organized and existing under the laws of the United States of America pursuant to 12

7       U.S.C. §1811 et seq.  The FDIC brings this action pursuant to 12 U.S.C. §1819(a) in its

8       capacity as Receiver of NetBank.

9    4. Golden Key is a California corporation with a principal address of 2006 A St., Ste. 223,

10      Antioch, CA 94509.

11   5. Gbilia is a real estate agent and mortgage broker, engaged in business at 2006 A St., Ste.

12      223, Antioch, CA 94509.

13   6. 1st American is a title insurance underwriter and issues title insurance and closing

14      protection letters, having a place of business at 1 First American Way, Santa Ana,

15      California, 92707.

16   7. Stewart-Sac is a title agency and escrow holder having a place of business at 730

17      Alhambra Blvd., Ste 202, Sacramento, California 95816.

18   8. Stewart Title is a title insurance underwriter and issues title insurance and closing

19      protection letters, having a place of business at 1980 Post Oak Boulevard, Suite 710,

20      Houston, Texas 77056

21   9. United was a title insurance underwriter and issued title insurance and closing protection

22      letters, having a place of business at 3250 Wilshire Blvd, 18th Floor, Los Angeles, CA

23      90010.

24

1

2                                          <u>VENUE</u>

3    10. Venue is proper under 28 U.S.C. § 1391 in that most of the Defendants reside and/or

4         perform business in and otherwise are subject to personal jurisdiction in this judicial

5         district.

6    11. Five of the six residential properties that are the subject of the action are situated within

7         this judicial district.

8    12. A substantial part of the events or omissions giving rise to the claims alleged in this

9         Complaint (real estate transactions) occurred within this judicial district.

10   13. The various torts and breaches of contract committed by the Defendants occurred within

11        this judicial district.

12

13                                        <u>STANDING</u>

14   14. The claims in this Complaint arise out of eleven (11) loans (collectively, "Loans") made

15        regarding six (6) residential properties all funded by Meritage Mortgage Corporation

16        ("Meritage" or "Lender").

17   15. The Lender, with its principal place of business at 7215 Financial Way, Jacksonville, FL

18        32256, was in the business of making residential mortgage loans.

19   16. At all times relevant to the subject matter of this Complaint, the Lender was a wholly

20        owned subsidiary of NetBank.

21   17. Meritage transferred and assigned all of its interests in the Loans to NetBank.

22   18. On or before September 27, 2007, NetBank was a Federal Savings Bank with its principal

23        place of business at 1015 Windward Ridge Parkway, Alpharetta, GA 30005.

24

1    19. NetBank's deposits were insured by the FDIC.

2    20. Pursuant to Order No. 2007-43, issued by the Office of Thrift Supervision on September

3        27, 2007, the FDIC was appointed as Receiver of NetBank.

4    21. On September 28, 2007, the FDIC accepted its appointment as Receiver of NetBank in

5        accordance with the Federal Deposit Insurance Act, as amended, by Receiver-In-Charge,

6        Robert Schoppe. On the same date, NetBank's bank charter was revoked and its assets

7        were placed in a FDIC Receivership.

8    22. The FDIC has a substantial legal interest in the subject matter of this case because, as

9        Receiver of NetBank and by express operation of law, the FDIC assumes all rights, titles,

10       powers, privileges, and operations of NetBank. In this case, NetBank has failed and no

11       longer operates as a financial institution. The FDIC has assumed complete control of

12       NetBank and all of its assets as its Receiver. Once FDIC became Receiver for NetBank,

13       all of its interests were transferred to the FDIC. See 12 U.S.C. § 1821(d)(2). As such,

14       the FDIC now operates as NetBank's successor in interest. Id. § 1821(d)(2)(A).

15

16                    **STATEMENT OF FACTS RELEVANT TO ALL COUNTS**

17                                     A. TRANSACTIONS

18   23. These claims arise out of a series of Loans funded by Lender to each Borrower, as

19       identified below, for the purchase of improved real estate (individually, "Transaction"

20       and collectively, "Transactions").

21   24. The Loans are more fully described as follows:

22

23                              (Left Intentionally Blank)

24

1

LOAN CHART

| Reference | "Borrower" | "Property Purchased" | "Date" | "Loan(s) Amount(s)" |
|---|---|---|---|---|
| "Peterson Loan" | Peterson, Jason | 1221 Campbell Street, Oakland, California | 12/27/05 | $610,000 |
| "Bullock Loan" | Bullock, Clifford | 5041 Winterglen Way, Antioch, California | 02/10/06 | $448,000 $112,000 |
| "Carlisle Loan" | Carlisle, Eugene | 3208 San Diego Way, Sacramento, California | 02/22/06 | $232,000 $58,000 |
| "Calvin Loan" | Calvin, Orlando | 441 E 9th Street, Pittsburg, California | 05/04/06 | $440,000 $110,000 |
| "Jackson Loan" | Jackson, Dionne | 608 Hichborn St., Vallejo, California | 06/16/06 | $105,000 $420,000 |
| "Human Loan" | Human, Yasir A. | 3214 Bear Ridge Way, Antioch, California | 06/30/06 | $138,000 $552,000 |

B. Brokers

25. It was the obligation of Gbilia and Golden Key (collectively, "Broker") to secure

information necessary for underwriting mortgage loans, i.e., the loan packages, which

include, among other things the:

    a. accurate residential real property valuations, or appraisals;

    b. correct social security numbers of the borrowers;

    c. correct borrowers' identities;

1      d. contracts of sale;

2      e. loan applications;

3      f. buyer's intended use for the Property Purchased (such as owner-occupied ("OO")

4         or investment);

5      g. verifications of deposit ("VOD");

6      h. verifications of employment ("VOE"); and/or

7      i. verifications of rent ("VOR").

8   26. To do so, Brokers had access to materials explaining, inter alia, Lender's loan products

9      and lending requirements.

10  27. Brokers put together the Transactions and Loans by, inter alia:

11     a. finding the real estate;

12     b. finding and/or manufacturing the straw buyers;

13     c. gathering and/or manufacturing the Borrowers' financial information and

14        forwarding this packages to the Lender;

15     d. coordinating the Loan closings;

16     e. hiring the appraisers;

17     f. providing information to the relevant title agencies; and

18     g. creating and paying undisclosed kick backs to the borrowers and others.

19  28. Brokers knew the Underwriting Requirements, as defined below, at all relevant times.

20  29. In underwriting each Loan, the Lender required an accurate appraisal to determine, inter

21     alia, the loan-to-value ratio ("LTV").

22  30. The Broker chose and ordered the appraisal colluding with the appraiser to inflate the

23     values of the properties to increase the loan amounts thereby increasing the amount of

24

1    Loan proceeds that could be improperly taken by the Broker and his co-conspirators

2    (such as paying the buyer to obtain the Loan) ("Improper Appraisal Interaction" or

3    "IAI").

4    31. The Broker assisted the Borrower in filling out the credit application and related

5    documents; often the Broker assisted the Borrower in using a social security number

6    other than that of the Borrower to improperly and unlawfully enhance the Borrower's

7    credit ("Improper SS#" or "ISS#").

8    32. The Lender often required verification of the Borrowers' employment as an underwriting

9    criterion in determining whether or not to make a Loan. Sometimes, the Broker

10    fabricated and/or obtained false verifications of employment ("False VOE" or "FVOE")

11    to improperly and unlawfully enhance the Borrowers' creditworthiness.

12    33. The Lender often required verification of the Borrowers' rental payment as an

13    underwriting criterion in determining whether or not to make a Loan. Sometimes, the

14    Broker fabricated and/or obtained false verifications of Borrowers' rent ("False VOR" or

15    "FVOR") to improperly and unlawfully enhance the Borrower's creditworthiness.

16    34. The Lender often required verification of the Borrowers' deposit account as an

17    underwriting criterion in determining whether or not to make a Loan. Sometimes the

18    Broker fabricated and/or obtained false verifications of Borrower's deposit account

19    ("False VOD" or "FVOD") to improperly and unlawfully enhance the Borrower's

20    creditworthiness.

21    35. The Lender's underwriting criteria often required the Borrower to occupy the Property

22    Purchased if the Borrower identified OO as the intended use in determining whether or

23    not to make a Loan. Often the Brokers knew the Borrowers intended the Property

24

1    Purchased to be investment properties and did not intend to personally occupy the

2    Property Purchased but failed to disclose this material information to the Lender ("False

3    Owner Occupancy" or "FOO"). This often occurred when the Broker brokered numerous

4    properties to the same Borrower contemporaneously while identifying multiple properties

5    as being OO making simultaneous OO an impossibility.

6    36. The Lender always required the Borrower to be the legitimate borrower (not an identity

7    thief) as an underwriting criterion in determining whether or not to make a Loan.

8    Sometimes, the Broker knew the Borrower was using a fake identity to improperly and

9    unlawfully enhance the Borrower's creditworthiness ("Identity Theft" or "IT").

10   37. Sometimes the Broker unlawfully orchestrated a kick back to the Borrower failing to

11   disclose this information to the Lender ("Kick Back") (IAI, ISS, FVOE, FVOD, FVOR,

12   FOO, IT and Kick Back are collectively, "Broker Fraud").

13   38. The Broker Chart identifies the Broker Fraud perpetrated by the Broker regarding each

14   Loan:

15                              BROKER CHART

| Reference | "Basis of Liability" |
|-----------|---------------------|
| Peterson Loan | IAI, ISS#, FVOE, FOO, Kick Back, IT |
| Bullock Loan | IAI, ISS#, FVOE, FOO, FVOR |
| Carlisle Loan | IAI, ISS#, FVOE, FOO, Kick Back |
| Calvin Loan | IAI, ISS#, FVOE, FOO |
| Jackson Loan | IAI,      FVOE, FOO, Kick Back |
| Human Loan | IAI, ISS#, FVOE,      FVOD, IT |

1    (collectively, "Broker Bad Acts").

2                             C. LENDER/BANK

3    39. The Lender made the Loans.

4    40. Lender had certain underwriting requirements as conditions precedent to making the

5    Loans.

6    41. Lender's underwriting requirements, included without limitation the following

7    requirements:

8         a. the Borrower must meet certain creditworthiness based, in part, on accurate debt

9            to income ratio ("DTI Requirement");

10        b. the Borrower's use for the property, OO or investment, must be accurate ("Use");

11        c. the Borrower must not be a straw borrower and must not use identity theft;

12        d. the social security number used to verify identification must be accurate;

13        e. information on the HUD-1 Settlement Sheet ("HUD-1") (under stated penalties of

14           violation of 18 USC § 1001 including fine and imprisonment) must be accurate;

15        f. information on the VOD must be accurate, the purpose of which is to provide

16           proof of the Borrower's financial ability to pay the required settlement costs or

17           cash at closing;

18        g. information on the VOE must be accurate, the purpose of which is to provide

19           proof of the Borrower's financial ability to pay the Loan;

20        h. information on the VOR must be accurate, the purpose of which is to provide

21           proof of the Borrower's financial ability to pay the Loan; and

22        i. the property must appraise for a certain amount creating a specified loan to value

23           ratio ("LTV Requirement")

24

1     (collectively, the "Underwriting Requirements").

2     42. Lender issued closing instructions to each title agency explaining the conditions

3           precedent required to authorize the title agency, as Lender's agent, to close the

4           Transaction, consummate the Loans, and disburse the Loan proceeds ("Closing

5           Instructions"); unless the Closing Instructions were strictly followed, the title agency

6           should have returned the Loan proceeds and terminated the Loan and Transaction

7           closing.

8                           D. TITLE AGENCIES

9     43. As referenced in the Title Agency Chart below, the listed title agencies performed real

10          estate settlements and closings regarding the listed Loans.

11    44. The title agency was the gatekeeper for each Transaction.

12    45. Acting as an escrow holder each title agency, inter alia, received, coordinated the

13          execution of and notarized certain Transaction-related documents, including a HUD-1

14          (often under stated penalties of violation of 18 USC § 1001 and 1010 including fine and

15          imprisonment), received Closing Instructions, Loan funds, and prepared, signed and

16          printed certain checks disbursing Loan proceeds in connection with each Loan.

17    46. Prior to the closing of each Loan, the Lender provided written Closing Instructions to

18          each title agency; the Closing Instructions were to have been acknowledged by the title

19          agency's settlement agent and Borrower.

20    47. The Closing Instructions prescribed that the title agency was only authorized to close

21          each Loan subject to certain conditions set forth in the related Closing Instructions.

22    48. Real Estate Settlement Procedures Act ("RESPA"), HUD Regulation X as well as 18

23          U.S.C. § 1001 and 18 U.S.C. § 1010 require the HUD-1 to be accurate.

24

49. The Title Agency, as defined below, was required to and did draft each HUD-1 for each Loan.

50. Each Title Agency was responsible for properly closing each Loan in accordance with the law, closing instructions and title insurance underwriter's policies and procedures by, inter alia:

    a. directing the preparation, execution and recording of the loan documents, deeds and/or assignments;

    b. title abstracting and examination;

    c. preparing the HUD-1;

    d. conducting the settlement;

    e. collecting payments from the buyer and seller;

    f. fulfilling its duty to the Lender by, inter alia:

        i. strictly complying with the instructions of its principals;

        ii. doing all things normally done by an escrow holder even if not specified in its principals' instructions;

        iii. taking corrective steps in the event there is a conflict between the instructions of its principals;

        iv. communicating to its principal/Lender knowledge acquired in the course of its agency with respect to material facts which might affect the principal's/Lender's decision as to the pending Transaction; and

        v. exercising ordinary skill and diligence ("Escrow Holder Duty");

    g. verifying the identity of each buyer; and

h.  performing escrow services and distributing purchase money or refinance
    proceeds to the proper persons

(collectively, "Title Agent Duties").

51. The Title Agency performed certain actions regarding the Loans causing liability to the
Lender; by category, these include actions:

a.  "Excessive Real Estate Commission" or "ERC" is herein referred to as the Broker
    receiving a commission in excess of the amount reported on the HUD-1 or
    allowable by law;

b.  "Disguised Disbursement" or "DD" is herein referred to as the title agency
    incorrectly identifying a disbursement on the HUD-1 so as to disguise an
    unauthorized payment to a person or entity;

c.  "6% Violation" is herein referred to as the failure of the title agency to follow the
    Closing Instructions limiting the seller contribution to a maximum seller credit of
    a set amount or 6% of the sales price, whichever was lower;

d.  "Failure to Inform Lender of Immediate Prior Sale" or "FLIPS" is herein referred
    to as the title agency failing to effectively inform the Lender that the seller
    acquired the property less than one year prior to the closing for an amount
    substantially lower than the price being paid by the purchaser/borrower;

e.  "Unauthorized Disbursement" or "UD" is herein referred to as the title agency
    disbursing payment to a person or entity not authorized by the Lender;

f.  "Excessive Disbursement" or "ED" is herein referred to as the title agency
    disbursing payment in an amount that is facially excessive;

g. "Identity Theft" is herein referred to as the title agency allowing someone other than the real Borrower to sign documents closing the loan, in violation of the Closing Instructions and without disclosing the same to the Lender;

h. "Unauthorized Borrower Disbursement" or "UBD" is herein referred to as the title agency disbursing payment to a borrower when the Closing Instructions required the borrower to bring funds to the closing; and

i. "Fungible Borrower" or "FB" is herein referred to as the Title Agency substituting one borrower for another after the transaction was already underway.

TITLE AGENCY CHART

| Reference | "Title Agency" | "CPL Issuer" | "Basis of Liability" |
|---|---|---|---|
| Peterson Loan | Alliance Title Co. | 1st American | 6% Violation, UBD, UD, DD, ED, Identity Theft |
| Bullock Loan | New Century Title Co. | United | n/a |
| Carlisle Loan | Stewart-Sac | Stewart Title | 6% Violation, FLIP, UBD, UD |
| Calvin Loan | United Title Co. | United | 6% Violation, UBD, ERC |
| Jackson Loan | United Title Co. | United | 6% Violation, UBD, UD |
| Human Loan | Alliance Title Co. | 1st American | Identity Theft, UD, FB |

52. By committing the acts identified in the Title Agency Chart, the Title Agencies facilitated the Broker Fraud.

53. In each act identified in the Title Agency Chart, the Title Agency should have terminated the transaction and returned the Lender's funds.

54. The Title Agency should have effectively notified the Lender before taking any act identified in the Title Agency Chart, inter alia, to fulfill its duty as Lender's agent.

### E. TITLE INSURANCE UNDERWRITERS

55. The relevant CPL Issuers benefitted from each Transaction by issuing two title insurance policies; one to the Lender and one to the buyer.

56. In order to sell title insurance to a buyer, inter alia, the Loan must be closed properly, good title must transfer from the seller to the buyer

57. In order to sell title insurance to the Lender, inter alia, the Lender's security interest must first be properly perfected.

58. Plaintiff is informed and believes, and on the basis of such information and belief alleges that the CPL Issuers provided guidance to their agent via bulletins, policy and procedure manuals, phone advice and/or training seminars.

59. Plaintiff is informed and believes, and on the basis of such information and belief alleges that the CPL Issuers routinely monitored their title agents' actions by performing routine audits of the title agents' records, including binders, accounting records and Transaction files.

60. The CPL Issuers as principal is responsible for its agent closing the Loans and Transactions in a manner complying with the law, closing instructions, its internal policies and procedures and industry standards of care.

61. In addition to providing title insurance to the Lender, the CPL Issuers provided a closing protection letter aka insured closing letter ("CPL") to the Lender to assure its Title Agent did not, inter alia, commit fraud or dishonesty handling the Lender's funds or documents in connection with the closing.

F. THE DEFAULT

62. Each of the Loans in the Damages Chart below are in default and caused the Plaintiff damages as identified below.

DAMAGES CHART

| Reference | Loan(s) Amount(s) | Basis for Loss | Loss | Interest | Total Damages |
|---|---|---|---|---|---|
| Peterson Loan (Defendants - 1st American & Brokers) | $610,000 | REO Sale 01/31/08 for $190,000 | $480,589 | $228,279 | $708,868 |
| Bullock Loan (Defendants - Brokers) | $448,000 $112,000 | S&D Sale 05/29/08 S&D Sale 12/27/06 | $348,225 | $156,701 | $504,926 |
| Carlisle Loan (Defendants – | $232,000 $58,000 | REO Sale 06/24/08 | $248,458 | $111,806 | $360,264 |

| | | | | | |
|---|---|---|---|---|---|
| Stewart Title & Brokers) | | | | | |
| Calvin Loan (Defendants – United & Brokers) | $440,000 $110,000 | REO Sale 06/26/08 | 395,000 | $171,035 | $566,035 |
| Jackson Loan (Defendants – United & Brokers) | $105,000 $420,000 | S&D Sale 5/29/08 NFP | $72,438 | $30,786 | $103,224 |
| Human Loan (Defendants – 1st American & Brokers) | $138,000 $552,000 | S&D Sale 5/29/08 S&D Sale 5/29/08 | $476,100 | $195,201 | $671,301 |
| **Total** | **$3,225,000** | | **2,020,810** | **$893,808** | **$2,914,618** |

63. "REO Sale" means the Lender or its agent bought the Property Purchased at a foreclosure sale, remarketed and sold the Property Purchased; "S&D Sale" means the Lender or its agent sold the Loan at a scratch and dent sale for a loss; and "NFP" means there was no forced repurchase of the loan so there was no loss.

(Left Intentionally Blank)

| | |
|---|---|
| 1 | **FIRST CLAIM FOR BREACH OF CONTRACT** |
| 2 | **(AGAINST STEWART TITLE OF SACRAMENTO RE: THE CARLISLE LOAN)** |
| 3 | 64. Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 2 – |
| 4 | ___ of this Complaint. |
| 5 | 65. Stewart-Sac closed the Carlisle Loan. |
| 6 | 66. Lender sent written Closing Instructions regarding the Carlisle Loan to Stewart-Sac. |
| 7 | 67. Stewart-Sac agreed to be bound by the Closing Instructions by signing them below the |
| 8 | following: *[w]e, the undersigned, certify that we have read and will comply with these* |
| 9 | *instructions including all addendum pages. We have made no changes to the fees or debt* |
| 10 | *payoffs without written consent from the Lender.* |
| 11 | 68. The Carlisle Loan Closing Instructions stated *Seller may contribute up to maximum 6%* |
| 12 | *of purchase price towards closing costs not to exceed actual costs* limiting the seller |
| 13 | contribution to a maximum seller credit of $17,400 or 6% of the sales price, whichever |
| 14 | was lower. |
| 15 | 69. The Carlisle Loan Closing Instructions memorialize the existence of a contract ("Carlisle |
| 16 | CI Contract") between the Lender and Stewart-Sac regarding Stewart-Sac's handling of |
| 17 | the Carlisle settlement, including without limitation, Carlisle Loan, Carlisle Loan |
| 18 | documents and Carlisle Loan funds. |
| 19 | 70. The Lender performed its obligations under the Carlisle CI Contract, inter alia, by |
| 20 | sending to Stewart-Sac sufficient funds to consummate the Carlisle Loan and |
| 21 | Transaction, authorizing the payment of fees to Stewart-Sac as identified on the HUD-1 |
| 22 | upon the occurrence of duly noted conditions precedent, and otherwise performing its |
| 23 | |
| 24 | |

Page **18** of **32**

| | |
|---|---|
| 1 | tasks in preparing for the consummation of the Carlisle Loans, including without |
| 2 | limitation drafting and forwarding Carlisle Loan documentation. |
| 3 | 71. Stewart-Sac negligently breached the Carlisle CI Contract by making the UD and a DD |
| 4 | as identified on the HUD-1 to \$22,609.72 to *Michun Johnson Estimated Repairs* per |
| 5 | HUD-1 line 904. |
| 6 | 72. Plaintiff is informed and believes, and on the basis of such information and belief alleges |
| 7 | that there were no *repairs* to the Carlisle Purchased Property, rather the Carlisle Loan |
| 8 | Proceeds so identified really went to pay off the Illegal Kick Back, as defined below. |
| 9 | 73. Per the Carlisle Loan HUD-1, Stewart-Sac negligently breached the Carlisle CI Contract |
| 10 | by permitting a seller credit of \$30,377.79 or 79% more than authorized – in direct |
| 11 | contravention of Lender's Closing Instructions (Carlisle 6% Violation). |
| 12 | 74. The Carlisle 6% Violation also in reality changed the nature of the Transaction by |
| 13 | reducing the purchase price by all funds paid via seller contribution above the 6% |
| 14 | allowed in the Carlisle Closing Instructions from \$290,000 to \$277,022 causing the Loan |
| 15 | to exceed the LTV. |
| 16 | 75. The Carlisle CI Contract did not authorize Stewart-Sac to disburse Lender's proceeds or |
| 17 | settle the Transaction if the Carlisle Closing Instructions were breached by the Carlisle |
| 18 | 6% Violation. |
| 19 | 76. Stewart-Sac also negligently breached the Carlisle CI Contract by performing the UBD. |
| 20 | 77. The Carlisle CI Contract also required: *[c]opy of cashiers check showing borrower as* |
| 21 | *remitter to document sufficient funds to close* ("Buyer Cash Requirement"). |
| 22 | 78. The UBD violation in reality is a kick back, and it changed the nature of the risks |
| 23 | involved in the transaction by eliminating the Borrower's personal risk and avoided the |
| 24 | |

1    Lender's underwriting requirements reflected, inter alia, by the Buyer Cash Requirement

2    while raising fraud indicia that the Lender could have used to identify the Carlisle Loan

3    as being based on fraud.

4    79. The Carlisle CI Contract did not authorize Stewart-Sac to fund the Loan or settle the

5    Transaction if the Carlisle Closing Instructions were breached by the UBD.

6    80. As a result of the breach of the Carlisle CI Contract, the Lender and Plaintiff were

7    damaged by Stewart-Sac.

8    ## SECOND CLAIM FOR BREACH OF CONTRACT

9    ## (AGAINST STEWART TITLE GUARANTY COMPANY RE: THE CARLISLE LOAN)

10   81. Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 –

11   80 of this Complaint.

12   82. Stewart Title sent a written CPL to the Lender regarding the Carlisle Loan.

13   83. The Carlisle CPL was dated February 22, 2006 providing for reimbursement to the

14   Lender for actual loss incurred by the lender in connection with such closing in the event

15   of fraud or dishonesty of Stewart-Sac in handling the Lender's funds or documents in

16   connection with the Carlisle closing.

17   84. The Carlisle CPL memorialized the existence of a contract ("Carlisle CPL Contract")

18   between the Lender and Stewart Title regarding Stewart-Sac's handling of the Carlisle

19   settlement, including without limitation, Carlisle Loan, Carlisle Loan documents and

20   Carlisle Loan funds.

21   85. The Lender performed its obligations under the Carlisle CPL Contract by, inter alia,

22   purchasing title insurance for the Carlisle Loan.

23   86. Stewart-Sac closed the Carlisle Loan.

24

Page **20** of **32**

87. Stewart-Sac committed the Carlisle 6% Violation, UBD and UD each of which constituted fraud or dishonesty in handling the Lender's funds and documents in connection with the Carlisle closing.

88. Plaintiff made demand on Stewart Title Guaranty Company to honor the Carlisle CPL but Stewart Title refused to do so.

89. Stewart Title's failure to reimburse Plaintiff for its losses that resulted from Stewart-Sac's fraud and dishonesty constitute a breach of the Carlisle CPL Contract.

90. As a result of the breach of contract, the Lender and Plaintiff were damaged.

## THIRD CLAIM FOR BREACH OF CONTRACT

### (AGAINST FIRST AMERICAN TITLE INSURANCE CO. RE: THE PETERSON & HUMAN LOAN)

91. Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 – 90 of this Complaint.

92. Alliance Title Company ("Alliance") closed the Peterson and Human Loans.

93. 1st American sent written CPLs to the Lender regarding the Peterson and Human Loans.

94. The Peterson and Human CPLs, dated December 29, 2005 and June 6, 2006, respectively provided for reimbursement to the Lender for actual loss incurred by the lender in connection with such closings in the event of fraud or dishonesty of Alliance in handling the Lender's funds or documents in connection with the closings.

95. The Peterson and Human CPLs memorialize the existence of contracts ("Peterson CPL Contract" and "Human CPL Contract," respectively) between the Lender and 1st American regarding Alliance's handling of the Peterson and Human settlements, including without limitation, Peterson Loan, Human Loan, Peterson Loan documents,

1 | Human Loan documents, Peterson Loan funds and Human Loan funds; true copies of the
2 | Peterson and Human CPL Contracts are attached hereto.

3 | 96. The Lender performed its obligations under the Peterson CPL Contract and Human CPL
4 | Contract by, inter alia, purchasing title insurance for the Peterson and Human Loans.

5 | 97. Alliance closed the Peterson and Human Loans.

6 | 98. Lender sent written Closing Instructions regarding the Peterson and Human Loans to
7 | Alliance.

8 | 99. Alliance agreed to be bound by the Peterson and Human Closing Instructions by signing
9 | them below the following: *[w]e, the undersigned, certify that we have read and will*
10 | *comply with these instructions including all addendum pages. We have made no changes*
11 | *to the fees or debt payoffs without written consent from the Lender.*

12 | 100.    The Lender sent to Alliance sufficient funds to consummate the Peterson and
13 | Human Transactions to be disbursed, inter alia, pursuant to the Peterson Loan and Human
14 | Loan Closing Instructions.

15 | 101.    The Peterson Loan Closing Instructions stated *Seller may contribute up to*
16 | *maximum 6% of purchase price towards closing costs not to exceed actual costs* limiting
17 | the seller contribution to a maximum seller credit of $36,600.

18 | 102.    Per the Peterson Loan HUD-1, Alliance breached the Alliance Closing Instruction
19 | Contract by permitting a seller credit of $81,583.16 or almost 123% more than authorized
20 | – in direct contravention of Lender's Closing Instructions (Peterson 6% Violation).

21 | 103.    Plaintiff is informed and believes, and on the basis of such information and belief
22 | alleges that an individual named Maurice Cotton used the name Jason Peterson for the
23 | Peterson loan (Identity Theft).

24 |

104.    Due to the Identity Theft, the Lender's documents were not executed by the real Peterson.

105.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that an individual named Marlon Campbell was illegally paid $25,000 ("Illegal Kick Back") from the Peterson Loan proceeds controlled by Alliance.

106.    Alliance made the UD and a DD in the form of Peterson Loan Proceeds as identified on the HUD-1 to $25,000 to "Repair/Remodel to Contractor" per HUD-1 line 1309.

107.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that there was no repair or remodel to the Peterson Purchased Property, rather the Peterson Loan Proceeds so identified really went to pay off the Illegal Kick Back.

108.    Alliance disbursed from the Peterson Loan Proceeds a facially excessive appraisal fee - ED - of $1,200 per HUD-1 line 803 when normal appraisal fees should have been $350.00.

109.    Regarding the Peterson Loan, Alliance's actions constitute fraud or dishonesty in handling the Lender's funds and documents in connection with the Peterson closing by allowing the Identity Theft, Illegal Kick Back, 6% Violation, DD, ED and UD.

110.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that Yasir Human was one of many fictional names like Kirk Summer fabricated by Yusuf Bey, IV for the express purpose of qualifying for mortgage loans in a mortgage loan fraud scheme; Bey may have used credit reports and bank statements in other people's names, and used fake Arabic names, addresses and Social Security numbers and dates of birth.

Page **23** of **32**

111.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that co-conspirator Marlon Campbell, who had a misdemeanor forgery conviction in his past, was helping associates create new identities to qualify for loans to buy cars and houses; he pleaded no contest to counterfeiting, forgery and assault with a deadly weapon, and he is serving a 12-year sentence at San Quentin.

112.    Plaintiff is informed and believes, and on the basis of such information and belief alleges that Bey was illegally paid money (UD) from the Lender's funds escrowed by Alliance for the Human Loan.

113.    Due to the Identity Theft, the Lender's documents were not executed by the real Human, if he exists.

114.    Due to the Identity Theft, the Lender's Human Loan Proceeds were improperly handled by Alliance.

115.    Alliance should not have allowed the FB regarding the Human Loan.

116.    Alliance should not have allowed the Identity Theft regarding the Human Loan.

117.    Regarding the Human Loan, Alliance's actions constitute fraud or dishonesty in handling the Lender's funds and documents in connection with the Human closing by allowing the FB, Identity Theft and UD.

118.    Plaintiff made demand on 1st American to honor the Peterson and Human CPLs but 1st American refused to do so.

119.    1st American's failure to reimburse Plaintiff for its losses that resulted from Alliance's fraud and dishonesty constitute a breach of the Human CPL Contract.

120.    As a result of the breach of contract, the Lender and Plaintiff were damaged.

1

## FOURTH CLAIM FOR BREACH OF CONTRACT

2

### (AGAINST UNITED CAPITAL TITLE INSURANCE CO. RE: THE CALVIN & JACKSON LOANS)

3     121.    Plaintiff adopts and incorporates by reference the allegations contained in

4             paragraphs 1 – 120 of this Complaint.

5     122.    United Title Company ("UTC") closed the Calvin and Jackson Loans.

6     123.    United sent a written CPL to the Lender regarding the Calvin Loan.

7     124.    Plaintiff is informed and believes, and on the basis of such information and belief

8             alleges that United sent a written CPL to the Lender regarding the Jackson Loan.

9     125.    The Calvin CPL, dated April 24, 2006, provided for reimbursement to the Lender

10            for actual loss incurred by the lender in connection with such closing in the event of fraud

11            or dishonesty of Alliance in handling the Lender's funds or documents in connection with

12            the closing.

13    126.    Plaintiff is informed and believes, and on the basis of such information and belief

14            alleges that the Jackson CPL provided for reimbursement to the Lender for actual loss

15            incurred by the lender in connection with such closing in the event of fraud or dishonesty

16            of Alliance in handling the Lender's funds or documents in connection with the losing.

17    127.    The Calvin and Jackson CPLs memorialize the existence of contracts ("Calvin

18            CPL Contract" and "Jackson CPL Contract," respectively) between the Lender and

19            United regarding UTC's handling of the Calvin and Jackson settlements, including

20            without limitation, Calvin Loan, Jackson Loan, Calvin Loan documents, Jackson loan

21            Documents, Calvin Loan funds and Jackson Loan funds.

22    128.    The Lender performed its obligations under the Calvin CPL Contract and Jackson

23            CPL Contract by, inter alia, purchasing title insurance for the Calvin and Jackson Loans.

24

1     129.     Lender sent written Closing Instructions regarding the Calvin and Jackson Loans

2     to UTC.

3     130.     UTC agreed to be bound by the Calvin Closing Instructions by signing them

4     below the following: *[w]e, the undersigned, certify that we have read and will comply*

5     *with these instructions including all addendum pages. We have made no changes to the*

6     *fees or debt payoffs without written consent from the Lender.*

7     131.     Plaintiff is informed and believes, and on the basis of such information and belief

8     alleges that UTC agreed to be bound by the Jackson Closing Instructions.

9     132.     The Lender sent to UTC sufficient funds to consummate the Calvin and Jackson

10     Transactions to be disbursed, inter alia, pursuant to the Calvin Loan and Jackson Loan

11     Closing Instructions.

12     133.     The Calvin Loan Closing Instructions stated *Seller may contribute up to a*

13     *maximum 6% of purchase price towards closing costs not to exceed actual costs* limiting

14     the seller contribution to a maximum seller credit of $33,000.

15     134.     Per the Calvin Loan HUD-1, UTC breached the Closing Instructions by

16     permitting a seller credit of $64,507.95 – almost 100% more than authorized – in direct

17     contravention of Closing Instructions (Calvin 6% Violation).

18     135.     The Calvin Closing Instructions also required the Buyer Cash Requirement.

19     136.     The Calvin UBD of $1,148.72 in reality is a kick back and it changed the nature

20     of the risks involved in the transaction by eliminating the Borrower's personal risk and

21     avoided the Lender's underwriting requirements reflected, inter alia, by the Buyer Cash

22     Requirement while raising fraud indicia that the Lender could have used to identify the

23     Calvin Loan as being based on fraud.

24

137.     In the Calvin Transaction, UTC allowed Golden Key, as the seller's agent, and
REMAX Associates, as the listing broker to receive an excessive commission of
$40,000.00 (ERC).

138.     The Calvin Loan Closing Instructions did not authorize UTC to fund the Calvin
Loan or settle the Calvin Transaction if breached by the 6% Violation, UBD or ERC.

139.     The Jackson Loan Closing Instructions stated *31,500.00 Max. Credit allowed
(6%) or all fee[']s minus Prepays* limiting the seller contribution to a maximum seller
credit of $31,500.00.

140.     Per the Jackson Loan HUD-1, UTC breached the Closing Instructions by
permitting a seller credit of $55,347.32 – 76% more than authorized – in direct
contravention of Lender's Closing Instructions (Jackson 6% Violation).

141.     Plaintiff is informed and believes, and on the basis of such information and belief
alleges that the Jackson Loan Closing Instructions also required the Buyer Cash
Requirement.

142.     The Jackson UBD of $2,731.39 violation in reality is a kick back and it changed
the nature of the risks involved in the transaction by eliminating the Borrower's personal
risk and avoided the Lender's underwriting requirements reflected, inter alia, by the
Buyer Cash Requirement while raising fraud indicia that the Lender could have used to
identify the Jackson Loan as being based on fraud.

143.     UTC made the following unauthorized and clearly improper disbursements of
Lender's funds (UD) regarding the Jackson Loan:

  a.  Line 1303 - $20,000 to Invoice for Work "NEED INVOICE" to "NEED
      INVOICE;"

b. Line 1301 – $150.00 LGS REPORTS "NEED INVOICE" to "NEED INVOICE;" and

c. Line 1306 - $350 FIRST AMERICAN HOME BUYERS "NEED INVOICE" to "NEED INVOICE."

144.    The Jackson Loan Closing Instructions did not authorize UTC to fund the Jackson Loan or settle the Jackson Transaction if breached by the 6% Violation, UBD or UD.

145.    Regarding the Calvin Loan, UTC's actions constitute fraud or dishonesty in handling the Lender's funds and documents in connection with the Calvin closing by allowing the 6% Violation, UBD and/or ERC.

146.    Regarding the Jackson Loan, UTC's actions constitute fraud or dishonesty in handling the Lender's funds and documents in connection with the Calvin closing by allowing the 6% Violation, UBD and/or UD.

147.    Plaintiff made demand on United to honor the Calvin and Jackson CPLs but United refused to do so.

148.    United's failure to reimburse Plaintiff for its losses that resulted from UTC's fraud and dishonesty constitute a breach of the Calvin and Jackson CPL Contracts.

149.    As a result of the breaches of contracts, the Lender and Plaintiff were damaged.

## FIFTH CLAIM FOR NEGLIGENCE

### (AGAINST STEWART TITLE OF SACRAMENTO RE: CARLISLE)

150.    Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 3 – 149 of this Complaint.

151. Stewart-Sac in its capacity as an escrow holder of the funds for the Transaction, owed duties of good faith, honesty and reasonable care to the Lender in closing the Transaction.

152. Stewart-Sac owed the Lender, inter alia, the Title Agent Duties, legal duties based on 18 U.S.C. § 1001 and 18 U.S.C. § 1010, RESPA, HUD Reg X, FIRREA, and duties based on Stewart Title's policies and procedures for its agents and/or the Closing Instructions.

153. Stewart-Sac breached the Title Agent Duties owed to Lender by allowing the 6% Violation, FLIP, UBD, UD and DD, and by failing to properly notify the Lender thereof.

154. Stewart-Sac thereby enabled the Broker Fraud.

155. Stewart-Sac violated the standard of care of an escrow holder.

156. Stewart-Sac should never have closed the Carlisle Transaction and had a duty to return the Lender's funds to the Lender.

157. The Lender reasonably relied on Stewart-Sac to properly disclose the 6% Violation, FLIP, UBD, UD and DD.

158. The Lender reasonably relied on Stewart-Sac to properly confirm, collect and disburse all Calvin Loan and Calvin Transaction proceeds according to the Calvin Closing Instructions.

159. The Lender reasonably relied on Stewart-Sac to strictly comply with the terms of the Calvin Closing Instructions.

160. The Lender reasonably relied on Stewart-Sac to communicate to Lender knowledge acquired in the course of its agency with respect to material facts, which might affect the Lender's decision as to the pending Transaction.

Page **29** of **32**

161.    As a direct and proximate result of the aforementioned negligent acts and

omissions of Stewart-Sac, Lender and Plaintiff have been damaged as set forth in the

Damages Chart.

## SIXTH CLAIM FOR NEGLIGENCE

### (AGAINST SAMUEL GBILIA AND GOLDEN KEY REALTY &

### MORTGAGE BANKER RE: CARLISLE)

162.    Plaintiff adopts and incorporates by reference the allegations contained in

paragraphs 1 – 161 of this Complaint.

163.    The Broker in its capacity as an entity handling the underwriting information

owed duties of good faith, honesty and reasonable care and includes a duty of full

disclosure of all material facts concerning the transaction that might affect the principal's

decision to the Lender in closing each Transaction.

164.    Brokers owed the Lender, inter alia, duties of appropriate care and diligence based

on 18 U.S.C. § 1001 and 18 U.S.C. § 1010, RESPA, HUD Reg X, FIRREA, and

Business and Professions Code section 10232.5, and their position as a broker for Lender.

165.    Brokers breached their duties owed to Lender in each Transaction by committing

the Broker Bad Acts.

166.    The Lender reasonably relied on the accuracy of information provided by the

Brokers to it to determine whether or not to make each of the Loans and the terms of each

of the Loans.

167.    As a direct and proximate result of the aforementioned negligent acts and

omissions of Brokers, Lender and Plaintiff have been damaged in each Loan as set forth

in the Damages Chart.

| | |
|---|---|
| 1 | **SEVENTH CLAIM FOR FRAUD** |
| 2 | **(AGAINST SAMUEL GBILIA AND GOLDEN KEY REALTY &** |
| 3 | **MORTGAGE BANKER RE: CARLISLE)** |
| 4 | 168.    Plaintiff adopts and incorporates by reference the allegations contained in |
| 5 | paragraphs 1 – 167 of this Complaint. |
| 6 | 169.    The Brokers made a misrepresentation (false representation, concealment or |
| 7 | nondisclosure) each time they performed a Broker Bad Act. |
| 8 | 170.    The Brokers knew the falsity involved with each Broker Bad Act. |
| 9 | 171.    The Brokers performed each Broker Bad Act with the intent to defraud the Lender |
| 10 | into making the relevant loan by, i.e. inducing reliance on material false underwriting |
| 11 | information such as the Borrower's social security numbers and employment |
| 12 | information. |
| 13 | 172.    The Lender justifiably relied on the information provided by the Brokers to the |
| 14 | Lender while processing and funding the each Loan. |
| 15 | 173.    As a direct result of the Broker's conduct, Lender and Plaintiff have been |
| 16 | damaged on each Loan as set forth in the Damages Chart. |
| 17 | **PRAYER FOR RELIEF** |
| 18 | WHEREFORE, Plaintiff, FDIC, demands judgment as follows: |
| 19 | 1.  As against Stewart Title of Sacramento as identified in the Damages Chart in |
| 20 | compensatory damages, plus lost profits or in the alternative interest, costs, and any and |
| 21 | all other relief to which this Court finds it entitled; |
| 22 | 2.  As against Stewart Title Guaranty Company, First American Title Insurance Company |
| 23 | and United Capital Title Insurance Company as identified in the Damages Chart in |
| 24 | |

1    compensatory damages, plus lost profits, costs, and any and all other relief to which this

2    Court finds it entitled;

3    3. As against Samuel Gbilia and Golden Key Realty and Mortgage Banker, Inc. as

4        identified in the Damages Chart in compensatory damages, plus interest, costs, and any

5        and all other relief to which this Court finds it entitled.

6

7    David L. Fleck, Esquire
     DavidFleck@RudowLaw.com
8    Rudow Law Group, LLC
     5603 Newbury Street
9    Baltimore MD 21209
     Telephone: (410) 542-6000
10   Facsimile: (410) 542-9500
     Attorney for Plaintiff FDIC in its capacity as Receiver of NetBank
11   By: /s/ David L. Fleck CA State Bar ID No.: 192912

12   David L. Fleck      Digitally signed by David L. Fleck
                          DN: cn=David L. Fleck, o=Rudow Law
                          Group, LLC, ou,
                          email=DavidFleck@RudowLaw.com, c=US
13   David L. Fleck      Date: 2010.09.22 10:55:16 -04'00'

14   9/22/10

15

16

17

18

19

20

21

22

23

24